United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KAREN BURZDAK,

Plaintiff,

v.

UNIVERSAL SCREEN ARTS, INC.,

Defendant.

Case No. 21-cv-02148-EMC

**ORDER DENYING DEFENDANT'S MOTION TO COMPEL ARBITRATION**

Docket No. 20

Plaintiff Karen Burzdak has filed a class action against Defendant Universal Screen Arts, Inc. ("USA"), asserting that it has a "practice of deceptively enrolling consumers into a paid and automatically renewing membership program." Compl. at 1. She has pled violations of California Business & Professions Code §§ 17600 and 17200. Currently pending before the Court is USA's motion to compel arbitration. Having considered the parties' briefs and accompanying submissions, the Court hereby **DENIES** the motion to compel.

## I. FACTUAL & PROCEDURAL BACKGROUND

### A. Complaint

In her complaint, Ms. Burzdak alleges as follows.

USA is a "multi-company retailer that owns and operates myriad e-commerce websites and brands including Acorn, Bas Bleu, Daedalus Books, Signals, Support Plus, and What on Earth." Compl. ¶ 1. After a consumer places and finalizes an order from one of USA's websites, she is presented with a free shipping option in a pop-up box. *See* Compl. ¶¶ 2, 16. For example:

Signals
VIP INSIDER
THANK YOU FOR YOUR ORDER!
Claim Your Free Shipping Refund Now!
HURRY! THAT'S $8.99 ON TODAY'S ORDER
To claim your free shipping, provide your information below and click SUBMIT to join Signals VIP Insider today!
Offer and Billing Details: By submitting your email address, you agree to enroll in a free 7-day trial of the Signals VIP Insider program and the Terms of Use. Unless you cancel during your trial, we'll automatically continue your membership benefits for $14.95 a month, plus taxes, if any, charged to the same card ending in 4726 that you used for today's purchase. Cancel anytime online or by calling 888-706-7673.
Email Address
SUBMIT
As A VIP Insider Member, Discover All The Ways You Can Save!
%
10% CASH BACK & SHIPPING REBATES AT SIGNALS AND OUR FAMILY OF BRANDS
Signals
ACORN
BAS BLEU
Daedalus Books
Support Plus

Compl. ¶ 16. "[S]electing the free shipping option automatically enrolls [consumers] into a 7-day free trial to [USA's] VIP Insider membership program that renews every month for $14.95." Compl. ¶ 2. Although there is text in the pop-up box that mentions the VIP Insider membership program, the free trial, the automatic renewal, and the cost thereafter, Ms. Burzdak asserts that the information is not clear and conspicuous. *See* Compl. ¶ 19.

In addition, Ms. Burzdak maintains that cancelling the VIP Insider membership is difficult. A consumer cannot "simply visit [the] website [where she made the purchase] and cancel the membership." Compl. ¶ 21. Instead, a consumer can cancel the membership online only if she first creates an account with a different website (*e.g.*, signalsvipinsider.com). *See* Compl. ¶ 21(ii). Also, although consumers can call a toll-free number to request cancellation, "[s]ome consumers have reported issues reaching [a] representative and some complain about being charged despite requesting to cancel." Compl. ¶ 21(i). *See, e.g.*, Compl. ¶ 23 (discussing a complaint made about trying to cancel by phone). Because USA "does not offer a timely and easy-to-use mechanism for cancelling the membership," consumers have suffered "repeat and ongoing unauthorized charges." Compl. ¶ 4.

United States District Court
Northern District of California

     United States District Court
Northern District of California

With respect to Ms. Burzdak specifically, she made a purchase through Bas Bleu (one of USA's e-commerce websites) in October 2020. *See* Compl. ¶ 26. After she made the purchase, she responded to the pop-up box and enrolled in the VIP Insider membership program. She did not intend to enroll in the program and was not aware that she was enrolled "as part of her purchase process." Compl. ¶ 27. Seven days after her purchase, USA charged Ms. Burzdak's debt card $14.95 for the program. The deduction was automatically made for three months – November 2020, December 2020, and January 2021. *See* Compl. ¶ 28. Ms. Burzdak did not see the charges for about three months. When she discovered them, she called USA immediately to cancel the membership. *See* Compl. ¶ 30.

Based on, *inter alia*, the above allegations, Ms. Burzdak alleges a violation of California's Automatic Renewal Law, codified at California Business & Professions Code § 17600 *et seq*. *See, e.g.*, Cal. Bus. & Prof. Code § 17602(a) (providing that "[i]t shall be unlawful for any business that makes an automatic renewal offer . . . to a consumer" to, *e.g.*, "[f]ail to present the automatic renewal offer terms . . . in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity . . . to the request for consent to the offer"). She also alleges a violation of § 17200. She seeks to represent a class defined as follows: "All persons in the State of California who were charged for a VIP Insider membership." Compl. ¶ 31.

B. <u>Arbitration Agreement</u>

USA contends that the claims asserted by Ms. Burzdak must be compelled to arbitration based on an agreement between the parties. In support of its motion to compel arbitration, USA has provided evidence related to the arbitration agreement and the surrounding circumstances. According to USA, "Ms. Burzdak enrolled in the VIP Insider membership program by Bas Bleu on or about October 25, 2020." Radigan Decl. ¶ 3. An offer related to the program was presented to Ms. Burzdak as part of a post-purchase process. The offer was presented "with the option of receiving a free shipping refund on her order." Radigan Decl. ¶ 5. Below is a part of "the offer and blank enrollment form in substantially the same form as it would have been presented to Ms. Burzdak on or about October 25, 2020." Radigan Decl. ¶ 5.

VIP INSIDER
by BAS BLEU

THANK YOU FOR YOUR ORDER!

Claim Your **Free Shipping** Refund Now!

**HURRY! THAT'S $9.99 ON TODAY'S ORDER**

To claim your **free shipping**, provide your information below and click **SUBMIT** to join ***VIP Insider by Bas Bleu*** today!

**Offer and Billing Details:** By submitting your email address , you agree to enroll in a free 7 day trial of the VIP Insider by Bas Bleu program and the Terms of Use. Unless you cancel during your trial, we'll automatically continue your membership benefits for $14.95 a month, plus taxes, if any, charged to the same card that you used for today's purchase. Cancel anytime online or by calling 866-221-2476.

Email Address

SUBMIT

**As A VIP Insider Member, Discover All The Ways You Can Save!**

%

**10% CASH BACK & SHIPPING REBATES AT BAS BLEU AND OUR FAMILY OF BRANDS**

Signals ACORN BAS BLEU Daedalus Books whatonearth Support Plus

Radigan Decl., Ex. 1 (offer). After Ms. Burzdak entered her email address and clicked the "Submit" button, "she would have been informed on a new webpage, 'Welcome to VIP Insider by Bas Bleu." Radigan Decl. ¶ 9; *see also* Radigan Decl., Ex. 2 (welcome page).

As indicated above, the paragraph in the middle refers to the Terms of Use for the VIP Insider membership program: "By submitting your email address, you agree to enroll in a free 7 day trial of the VIP Insider by Bas Bleu program and the Terms of Use." "The phrase 'Terms of Use' is underlined to indicate it is a hyperlink." Radigan Decl. ¶ 7. However, the phrase is not highlighted through, *e.g.*, the use of a different color for the font.

"[A] 'Terms of Use' hyperlink was also included at the bottom of the enrollment webpage." Radigan Decl. ¶ 11. (Although not entirely clear, USA seems to be referring to the "Helpful Links" at the bottom of the enrollment webpage, one of which is the Terms of Use. *See* Radigan Decl., Ex. 1. Ms. Burzdak claims that she did not receive the entirety of this webpage, but rather only the portion copied above. *See* Opp'n at 2.)

Finally, an email acknowledgment was sent to Ms. Burzdak following her enrollment. At the very bottom of the email (in small font), there is the following sentence: "See Terms of Use for full details." Radigan Decl., Ex. 4.

A copy of the applicable Terms of Use can be found at Exhibit 3 to the Radigan declaration. Radigan Decl. ¶ 10.

- The Terms of Use do not mention the arbitration agreement in the first paragraph.
- The Terms of Use consists of seventeen sections. The second to last section, titled "Disputes," contains the arbitration clause. The arbitration clause provides as follows:

> Any dispute relating in any way to your visit to vipinsiderbasbleu.com or to products you purchase through vipinsiderbasbleu.com shall be submitted to confidential arbitration in Ohio, except that, to the extent you have in any manner violated or threatened to violate vipinsiderbasbleu.com's intellectual property rights, We may seek injunctive or other appropriate relief in any state or federal court in the state of Ohio, and you consent to exclusive jurisdiction and venue in such courts. Arbitration under this agreement shall be conducted under the rules then prevailing of the American Arbitration Association, Inc. The arbitrator's award shall be binding and may be entered as a judgment in any court of competent jurisdiction. To the fullest extent permitted by applicable law, no arbitration under this Agreement shall be joined to an arbitration involving any other party subject to this Agreement, whether through class arbitration proceedings or otherwise.

Radigan Decl., Ex. 3 (Terms of Use).

## II. DISCUSSION

### A. Legal Standard

USA contends that the Federal Arbitration Act ("FAA") governs the instant case, and Ms. Burzdak does not argue to the contrary. Under the FAA, an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The final clause of § 2, its saving clause, permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 432 (9th Cir. 2015) (internal quotation marks omitted).

United States District Court
Northern District of California

B. Contract Formation

Although Ms. Burzdak does not dispute that the FAA governs, she challenges USA's contention that the parties had an agreement to arbitrate. Whether there was an agreement to arbitrate is a matter of contract formation. The FAA does not govern this question of contract formation. Instead, contract formation is governed by state law. As to which state's law governs on the issue of contract formation, Ms. Burzdak contends that California law applies. USA suggests that the governing law is either that of California or Ohio,[1] but also indicates that there is no material difference between the two, at least with respect to contract formation. Therefore, as a practical matter, the Court focuses on California law alone.[2]

In the instant case, whether Ms. Burzdak agreed to arbitrate depends, in the first instance, on whether she agreed to the Terms of Use (which contain the arbitration clause). The Ninth Circuit has noted that, as a general matter, courts enforce browsewrap agreements[3] (similar to the agreement at issue in the instant case) where (1) the website user had *actual knowledge* of the agreement or (2) the website puts a reasonably prudent website user on *inquiry notice* of the terms of the agreement. *See Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1176-77 (9th Cir. 2014). This is consistent with California law. *See Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 566 (9th Cir. 2014) (noting that, under California law, "'[a]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious'"). Because USA does not argue that Ms. Burzdak had actual knowledge of the Terms of Use, the issue for the

[1] USA is a Ohio corporation.

[2] "The issue of contract formation . . . is not a delegable gateway issue" (*i.e.*, an issue for an arbitrator to decide instead of a court). *Eiess v. USAA Fed. Sav. Bank*, 404 F. Supp. 3d 1240, 1248 (N.D. Cal. 2019). USA does not dispute such; it argues only that the arbitrator has been delegated the issues of enforceability and scope of the arbitration agreement. *See* Mot. at 6.

[3] A browsewrap agreement differs from a clickwrap agreement – the latter requiring a user to click a box indicating that the user agrees to the terms of the agreement. *See Nguyen*, 763 F.3d at 1175-76 (noting that, with clickwrap agreements, "website users are required to click on an 'I agree' box after being presented with a list of terms and conditions of use"; in contrast, with browsewrap agreements, "a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen").

Court is whether a reasonably prudent website user was put on inquiry notice of the Terms of Use.[4] The Ninth Circuit has explained:

> Whether a user has inquiry notice of a browsewrap agreement, in turn, depends on the design and content of the website and the agreement's webpage. Where the link to a website's terms of use is buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it, courts have refused to enforce the browsewrap agreement. On the other hand, where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap agreements. *In short, the conspicuousness and placement of the "Terms of Use" hyperlink, other notices given to users of the terms of use, and the website's general design all contribute to whether a reasonably prudent user would have inquiry notice of a browsewrap agreement.*

*Nguyen*, 763 F.3d at 1177 (emphasis added).

In support of her argument that the Terms of Use were not conspicuous, Ms. Burzdak cites the Ninth Circuit's decision in *Lee v. Intelius Inc.*, 737 F.3d 1254 (9th Cir. 2013), as well as several district court cases. *See* Opp'n at 7-9. Like the instant case, *Intelius* involved a seven-day free trial of a product after which there was an automatic monthly fee. However, the facts relevant to the conspicuousness of the Terms and Conditions in *Intelius* are distinguishable from the facts relevant to the conspicuousness of the Terms of Use in the instant case. For example, in the instant case, there is a reference to the Terms of Use in close visual proximity to the "Submit" button. In contrast, in *Intelius*, there was no reference to the Terms and Conditions in close visual proximity to the relevant button. Below is the relevant screen shown to the consumer in *Intelius*.

[4] In its reply brief, USA contends that Ms. Burzdak improperly conflates the above inquiry notice standard with the substantive standard in determining whether there has been a violation of the California Automatic Renewal Law. *See* Reply at 1, 4; *see also* Cal. Bus. & Prof. Code § 17602(a) (providing that it is unlawful for a "business that makes an automatic renewal offer or continuous service offer to a consumer" to "[f]ail to present the automatic renewal offer terms or continuous service offer terms in a clear and conspicuous manner before the subscription or purchasing agreement is fulfilled and in visual proximity . . . to the request for consent to the offer") (emphasis added). Although the Court is not unsympathetic to USA's implicit concern here – *i.e.*, that the decision on the motion to compel arbitration will impact the substantive merits of the case – the inquiry notice standard does require the Court to consider whether the Terms of Use were clear and conspicuous as that term is used by the California Automatic Renewal Law.



*See also Intelius*, 737 F.3d at 1261 (agreeing with district court that plaintiff did not enter into a contract to arbitrate because "'[n]either the text above the 'YES' button nor the 'Offer Details' themselves mention the 'Privacy Policy' or the 'Terms and Conditions'"; "[t]he arbitration clause was contained in the 'Terms and Conditions' that Lee would have seen only if he clicked on the hyperlink *below* 'Offer Details' on the right-hand side of the webpage") (emphasis added).  There was no clear statement that clicking the "Yes" button indicates acceptance of the Terms and Conditions, though that fact could arguably be inferred.

Instead of *Intelius*, the Ninth Circuit's decision in *Lee v. Ticketmaster L.L.C.*, 817 Fed. Appx. 393 (9th Cir. 2020), is more informative.  Below are the relevant screens that were shown to the consumer in *Ticketmaster*.

ticketmaster Concerts Sports Arts & Theater More Sign In Help

What's Happening in San Francisco, CA

Find millions of live experiences

Sign In. Get Going.

Discover millions of live events, receive alerts when your favorites hit the road, and checkout with ease with your Ticketmaster account.

Email Address

Password

Remember Me

Sign In

Forgot Password?

New to Ticketmaster? Sign up

By continuing past this page, you agree to our Terms of Use.

Let's get personal.
Sign in to see events we picked - just for you.

We're building a new Ticketmaster Experience.
See What's Coming Soon

Recently Viewed

ticketmaster
Justin Timberlake - The Man Of The Woods Tour
Wed 12/05 @ 7:30pm, Oracle Arena
09:12

Payment
OFFICIAL CARD OF ticketmaster

Credit / Debit Card

Add New Card
* Required
Card Number *
Card Type *
Exp Month *
Exp Year *
Security Code *

Billing Address
Outside the US? Update delivery
First Name *
Last Name *
Address *
Unit #
Address Line 2
City *
State *
Zip Code *
Phone *
e.g. 310-555-1212
Alternate Phone
Store my card for faster checkout next time.

SEC 230
ROW 11
SEAT 20-21
verified tickets
Order Details
Total $222.95
By clicking "Place Order", you agree to our Terms of Use.
Place Order
TRUSTe Certified Privacy

*See Lee v. Ticketmaster L.L.C.*, No. 18-5987 VC (N.D. Cal.) (Docket No. 26) (Tobias Decl., Exs. F, H). The Ninth Circuit found that the Terms of Use in *Ticketmaster* were sufficiently conspicuous. It noted as follows:

> Lee validly assented to Ticketmaster's Terms of Use, including the arbitration provision, each time he clicked the "Sign In" button when signing into his Ticketmaster account, *where three lines below the button*, the website displayed the phrase, "By continuing past this page, you agree to our Terms of Use," as well as each time he clicked the "Place Order" button when placing an order for tickets, *where directly above the button*, the website displayed the phrase, "By clicking 'Place Order,' you agree to our Terms of Use," *where in both contexts, "Terms of Use" was displayed in blue font and contained a hyperlink to Ticketmaster's Terms*. Thus, Ticketmaster's website required users to "affirmatively acknowledge the agreement before proceeding," and "the website contain[ed] an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound." Lee "cannot avoid the terms of [the] contract on the ground that he . . . failed to read it before signing," especially when he "had a legitimate opportunity to review it." The fact that Lee indicated his assent to Ticketmaster's Terms of Use roughly

> twenty times during the relevant period only reinforces that he had many such opportunities.

*Ticketmaster*, 817 Fed. Appx. at 394-95. Unlike *Intelius*, the reader is clearly and explicitly informed that by clicking the subject boxes, the reader assents to the Terms of Use.

Based on the Ninth Circuit's *Ticketmaster* decision, this Court found that the Terms of Use in a slightly different Ticketmaster screen sufficiently conspicuous as well. *See Hansen v. Ticketmaster Entm't, Inc.*, No. 20-cv-02685-EMC, 2020 U.S. Dist. LEXIS 233538 (N.D. Cal. Dec. 11, 2020).

*Hansen v. Ticketmaster Entm't, Inc.*, No. C-20-2685 EMC (N.D. Cal.) (Docket No. 23) (Tobias Decl., Ex. 3).

This Court also took note of a similar holding reached by the Ninth Circuit in *Dohrmann v. Intuit, Inc.*, 823 Fed. Appx. 482 (9th Cir. 2020).

United States District Court
Northern District of California

intuit

turbotax quickbooks mint

Sign In

One account. Everything Intuit.
Sign in to your Intuit account to access all our products including TurboTax.
Learn more

User ID

Please enter a valid user ID.

Password

Remember me

Sign In

*By clicking Sign In, you agree to the Turbo Terms of Use, TurboTax Terms of Use and have read and acknowledge our Privacy Statement.*

I forgot my user ID or password

New to Intuit? Create an account.

Invisible reCAPTCHA by Google Privacy Policy and Terms of Use.

Legal Privacy Security

*In re Intuit Free File Litig.*, No. C-19-2546 CDB (N.D. Cal.) (Docket No. 97) (Sun Decl. ¶ 5). The Ninth Circuit held that "[t]he relevant warning language and hyperlink to the Terms of Use were conspicuous – they were the only text on the webpage in italics, were located directly below the sign-in button, and the sign-in page was relatively uncluttered. TurboTax's website therefore provided sufficient notice to a reasonably prudent internet user of its Terms of Use, which include

an arbitration clause." *Intuit*, 823 Fed. Appx. at 484. In all these cases, not only was assent to the Terms of Use explicit, but the hyperlink was clearly delineated, uncluttered by collateral language, and immediately proximate to the relevant button.

In the instant case, the Court finds that there are important differences between (1) the screens at issue in the *Ticketmaster* cases and in the *Intuit* case and (2) the screen at issue in the instant case.

- Although, in all cases, the font size for the Terms of Use is small (compared to the font size of other text on the same screen), the Terms of Use in the *Ticketmaster* and *Intuit* cases is visually highlighted to the eye by being in a brighter, different color (*i.e.*, blue). The underlining of the Terms of Use in the instant case does not have the same visual prominence as it is not highlighted by a different color which would also clearly connote a hyperlink.
- The *Ticketmaster* and *Intuit* screens do not distract the eye from the Terms of Use by giving visual prominence to other text. In contrast, in the instant case, visual prominence – through bolding, a different color, and/or capitalization – is given to other text, including "Free Shipping," and thus attention is diverted away from the Terms of Use.
- The sign-in screens in the *Ticketmaster* and *Intuit* cases simply ask the consumer to sign into an account. There is nothing promotional about the screens or any enticement which would distract the consumer from the content of the screens, including the reference to the Terms of Use (which as noted above are given visual prominence). In contrast, in the instant case, there is an obvious enticement and distraction – free shipping – which is also accompanied by the command "HURRY!"
- Although there is, in the instant case, some visual proximity between the Terms of Use and the relevant button ("Submit") – similar to the situation in the *Ticketmaster* and *Intuit* cases – the value of the visual proximity is reduced by the fact that the reference to the Terms of Use is buried in a relatively lengthy paragraph that

> largely focuses on and promotes free shipping and the VIP Insider program. This stands in contrast to both the *Ticketmaster* and *Intuit* cases where the Terms of Use are referred to in a short, simple sentence.

*See also Maree v. Deutsche Lufthansa AG*, No. SACV 20-885-MWF (MRWx), 2021 U.S. Dist. LEXIS 16452, at *8-9 (C.D. Cal. Jan. 26, 2021) (holding that Expedia.com's Terms of Use were not "sufficiently noticeable to put a reasonable user on inquiry notice of its provisions" – even though above the "Complete Booking" button, there was the statement: "By selecting to complete this booking I acknowledge that I have read and accept the Rules & Restrictions, Terms of Use . . . and Privacy Policy . . . and Government Travel Advice"); *Berman v. Freedom Financial Network, LLC*, No. 18-cv-01060-YGR, 2020 U.S. Dist. LEXIS 160406, at *8 (N.D. Cal. Sept. 1, 2020) (noting that the consumer is not clearly being asked to indicate her agreement to any Terms & Conditions where the buttons state: "This is correct, Continue!" and "Continue" – in spite of text above the buttons stating, "I understand and agree to the Terms & Conditions" and "I understand and agree to the Terms & Conditions which include mandatory arbitration").

Accordingly, the Court holds that, in the instant case, USA's pop-up screen did not put a reasonably prudent website user on inquiry notice of the Terms of Use and, therefore, Ms. Burzdak cannot be bound by the Terms of Use which contain the arbitration provision. The motion to compel arbitration is therefore denied.

## III. CONCLUSION

For the foregoing reasons, the Court denies USA's motion to compel arbitration. USA has within thirty (30) days from the date of this order to file a response to the complaint.

This order disposes of Docket No. 20.

**IT IS SO ORDERED**.

Dated: August 16, 2021

EDWARD M. CHEN
United States District Judge